DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@workandwage.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@workandwage.com
Ryan S. Dustin, Esq. (ISB No. 8683)
rdustin@workandwage.com
CASPERSON ULRICH DUSTIN PLLC
356 W. Sunnyside Rd., Suite B
Idaho Falls, ID 83402
Telephone: (208) 524-0566
Facsimile: (208) 745-2523

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
IN THE DISTRICT OF IDAHO

| | |
|---|---|
| ERIC JONES,<br><br>               Plaintiff,<br><br>v.<br><br>INFINITY MANAGEMENT AND INVESTMENTS, LLC,<br><br>               Defendant. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Filing Fee: $400.00 |

Plaintiff, Eric Jones, by and through his counsel of record, Casperson Ulrich Dustin PLLC, and as a cause of action against Defendant Infinity Management and Investments, LLC alleges and complaints as follows:

**JURISDICTION AND VENUE**

1.    This is an action brought under the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12101, *et seq.*, the Rehabilitation Act, 29. U.S.C. § 701, *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1343, and 1367.

3.      Venue in this action properly lies in the United States District Court for the District of Idaho,

        Eastern Division, pursuant to 28 U.S.C. § 1391(b) because the claims arose, in this judicial

        district; and venue also properly lies in this district pursuant to 42 U.S.C. § 2000e-5(f)(3)

        because the unlawful employment practices were committed in this judicial district.

## PARTIES

4.      Plaintiff Eric Jones ("Plaintiff" or "Jones") is a resident of the State of Idaho, County of

        Bonneville and worked for Infinity Management and Investments, LLC in Idaho Falls, Idaho.

5.      Infinity Management and Investments, LLC ("Defendant") is an Idaho limited liability

        company that manages rental properties in various locations with its principal place of

        business in Lewiston, Idaho and with an 80-unit complex in Idaho Falls, Idaho known as

        "The Butte Apartments."

6.      Defendant accepts federal funding related to its housing properties.

## FACTS COMMON TO ALL COUNTS

7.      Jones realleges and incorporates by reference paragraphs 1 through 6 as though fully set forth

        herein.

8.      Jones began working full time for Defendant in 2015 as a maintenance worker at The Butte

        Apartments.

9.      Jones has a disability that requires ongoing care and periodic medical attention.

10.     Jones informed Defendant of his disability soon after he started working there because it

        required occasional doctor visits.

11.     In late February 2018, Defendant sent Jones to Evanston, Wyoming to work on its properties

        there for an upcoming audit.

12.  While in Wyoming, Jones was struggling due to long work hours, being away from his family, and Defendant not giving him a firm date when he could return to Idaho Falls, all of which exacerbated his disability.

13.  During the week Jones was working in Wyoming, he asked Defendant several times to be allowed to return home earlier than scheduled.

14.  Defendant asked him to stay and finish the work.

15.  Jones ultimately stayed two days longer than originally planned.

16.  On or about March 2, 2018, Jones's then-fiancé Jami Williamson ("Williamson") informed Amy Collins Lobdell ("Lobdell"), Jones's supervisor, that Jones needed medical treatment and would be checking himself into inpatient care the following week. Williamson called to notify Defendant for purposes of FMLA, short-term disability, or for reasonable accommodations.

17.  Lobdell worked for Defendant in Idaho Falls.

18.  Jones checked himself into inpatient care on March 6, 2018, to address his disability.

19.  That morning, Williamson again called Lobdell to inquire about short-term disability or FMLA. Lobdell told Williamson that Jeremy Weeks ("Weeks"), Defendant's Human Resources Manager, was out of town. However, another of Lobdell's supervisors suggested Jones apply for unemployment because that would be best for Jones's family financially.

20.  Williamson told Lobdell that Jones did not want to apply for unemployment benefits because he wanted to continue to work and needed health insurance and time off for medical treatment.

21.  Jones remained in inpatient care for five days and then went home to continue to recover, continuing with treatment.

22.     Jones and Williamson expected to receive information about FMLA and/or short-term disability, but did not received anything.

23.     On or about April 3, 2018, Jones and Williamson spoke to Weeks, who asked Jones to email paperwork from his physician related to his absence, including work restrictions, and FMLA paperwork.

24.     On or about April 5, 2018, Jones received a letter from his health insurance company, Regence, which was paid for by Defendant, informing him that his health insurance was cancelled effective March 31, 2018.

25.     Ronald Jones, Jones's father, called Weeks regarding the cancelled health insurance. Weeks told Ronald Jones that the cancellation was due to a computer error or glitch in the system and reinstated Jones's health insurance the next day.

26.     Williamson called Regence and was informed it would be impossible for a computer error to cancel an individual's insurance coverage and that the only way a cancellation could occur would be if the employer called the insurance company and cancelled the individual's insurance coverage.

27.     On or about April 12, 2018, Jones emailed  to Weeks and Lobdell a Certification of Health Care Provider for Employee's Serious Health Condition (FMLA), which Jones's physician completed and which indicated that he should work no more than eight hours a day, two days per week from March until May. Weeks acknowledged receipt of the FMLA paperwork and said nothing about Jones allegedly not being eligible.

28.     After receiving the FMLA form, Weeks and Jones agreed that he would work four hours on Mondays and Fridays starting April 23, 2018, until Jones's physician released him to work full time.

29.     On or about April 23, 2018, Jones reported for work. Lobdell appeared to be upset with Jones and his medical leave. He asked for his tools and other personal belongings that were kept in the complex's maintenance shed. Lobdell told him the shed had been cleaned out and she had no idea where his tools were.

30.     Jones also discovered that within two weeks of checking into inpatient care, Defendant had hired a full time replacement to fulfill his job duties.

31.     The fact that his tools and belongings were missing, that Defendant had apparently replaced him, and that Lobdell showed animosity toward him, upset Jones to the point he broke down and was unable to work that day.

32.     Jones told Lobdell he was not ready to come back to work. Lobdell said she understood. Jones said either he or Williamson would call Weeks to work out Jones's schedule. Jones then went to Williamson's office.

33.     Williamson and Jones called Weeks twice that day (April 23), but were unable to speak with him. They left a voice message requesting a return call to discuss Jones's work schedule.

34.     Jones and Williamson believed Jones had 12 weeks of FMLA available to him for his medical leave and his absence was not a problem. Jones and Williamson expected Weeks to call to schedule his return to work after his FMLA leave.

35.     On or about May 16, 2018, Jones received a second letter from his health insurance company informing him his coverage would be cancelled May 31, 2018. As a result, Jones suspected Defendant terminated his employment, but received no termination letter.

36.     On or about May 22, 2018, Williamson emailed Weeks, informing him that Jones's doctor would release him to work part time for two weeks starting June 6, 2018 and then full time

starting June 20, 2018. Williamson also made clear she and Jones understood he was covered by FMLA.

37.   Weeks did not respond, which confirmed to Williamson and Jones that Defendant had fired him, as they previously suspected.

38.   On or about May 24, 2018, Jones dually filed a charge of discrimination with the Idaho Human Rights Commission and the Equal Employment Opportunity Commission.

39.   On or about May 31, 2018, Jones applied for unemployment based on his understanding that Defendant had fired him.

40.   On or about June 7, 2018, Jones received a Personal Eligibility Determination from the Department of Labor concerning Jones's application for unemployment benefits.

41.   Jones also received from the Department of Labor a copy of a letter John Stosich drafted on behalf of Defendant in which Mr. Stosich indicated Defendant terminated Jones's employment on May 9, 2018.

42.   Jones never received a copy of the May 9, 2018 termination letter from Defendant or Mr. Stosich directly.

43.   Jones did not report to work on June 6, 2018 because he understood Defendant had already terminated his employment.

44.   Jones received notices of right to sue from the IHRC and EEOC. Jones has exhausted any administrative remedies.

## COUNT I
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT/IDAHO HUMAN RIGHTS ACT
## (DISCRIMINATION)

45.   Jones realleges and incorporates by reference paragraphs 1 through 44 as though fully set forth herein.

46.     Jones had a disability as defined by the ADAAA in that he had an actual disability, a record of disability, or was regarded as disabled by Defendant.

47.     Jones was qualified for his maintenance job, and was able to perform the essential functions of his job with or without accommodation.

48.     Jones's disability substantially limits one or more major life activities, including his ability to focus, concentrate, sleep, and work.

49.     Jones was subjected to adverse employment actions by Defendant when it apparently discharged Jones in March 2018 and/or on or about May 9, 2018, on the basis of his disability.

50.     As a direct and proximate result of Defendant's actions and/or failure to act, Jones has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Jones is thereby entitled to general and compensatory damages in an amount to be proven at trial as well as any other equitable remedies available to him.

51.     Defendant's conduct was malicious and oppressive, and done with reckless disregard for Jones's federally protected rights, for which Jones is entitled to punitive damages.

## COUNT II
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT/ IDAHO HUMAN RIGHTS ACT
### (FAILURE TO ACCOMMODATE)

52.     Jones realleges and incorporates by reference paragraphs 1 through 51 above, as though fully incorporated herein.

53.     Jones requested a reasonable accommodation for his disability including leave to address his disability and a modified work schedule.

54.     Defendant provided a reasonable accommodation initially, but later refused to continue to provide the accommodation, and instead, terminated Jones's employment.

55. As a direct and proximate result of Defendant's actions and/or failure to act, Jones has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Jones is thereby entitled to general and compensatory damages in an amount to be proven at trial as well as any other equitable remedies available to him.

56. Defendant's conduct was malicious and oppressive, and done with reckless disregard for Jones's federally protected rights, for which Jones is entitled to punitive damages.

**COUNT III**
**FAMILY AND MEDICAL LEAVE ACT**
**(INTERFERENCE)**

57. Jones realleges and incorporates by reference paragraphs 1 through 56 above, as though fully incorporated herein.

58. Based on information and belief, Defendant did not employ 50 or more employees within a 75-mile radius of where Jones worked.

59. At all relevant times hereto, Jones believe he was covered by the FMLA.

60. Defendant was an employer subject to the protection provided by the FMLA.

61. Defendant made misrepresentations to Jones either affirmatively or by silence regarding the applicability of the FMLA to Jones.

62. Jones relied on Defendant's misrepresentations to his detriment, including by checking himself into inpatient care, taking and using leave, and arranging a part-time work schedule.

63. Defendant's misrepresentations and Jones's subsequent reliance entitled him to leave under the FMLA.

64. Defendant denied Jones the benefits to which he is entitled under the FMLA by terminating his employment (twice), failing to inform Jones of his rights under the FMLA, and failing to reinstate him.

65.     Based upon the foregoing, Defendant interfered with Jones's rights under the FMLA.

66.     As a direct and proximate result of Defendant's actions and/or failure to act, Jones has suffered and will continue to suffer, a loss of earnings, employment benefits, and job opportunities. Jones is thereby entitled to general damages, such amount to be proven at trial, plus interest, as well as any other equitable remedies available to him.

67.     Defendant's actions and/or failures to act were committed in bad faith, for which Jones is entitled to liquidated damages pursuant to 29 U.S.C. § 626(b).

## COUNT IV
## FAMILY AND MEDICAL LEAVE ACT
### (RETALIATION)

68.     Jones realleges and incorporates by reference paragraphs 1 through 67 above, as though fully incorporated herein.

69.     Jones availed himself of his protected rights under the FMLA by relying on Defendant's misrepresentations and taking FMLA leave.

70.     Defendant took adverse employment actions against Plaintiff, including but not limited to: terminating his employment (twice), failing to inform Jones of his rights under the FMLA, and failing to reinstate him.

71.     Defendant took such adverse employment actions against Jones due to Plaintiff's exercise of his protected rights under the FMLA.

72.     As a direct and proximate result of Defendant's actions and/or failure to act, Jones has suffered and will continue to suffer, a loss of earnings, employment benefits, and job opportunities. Jones is thereby entitled to general damages, such amount to be proven at trial, plus interest, as well as any other equitable remedies available to him.

73.   Defendant's actions and/or failures to act were committed in bad faith, for which Jones is entitled to liquidated damages pursuant to 29 U.S.C. § 626(b).

## COUNT V
## VIOLATION OF THE REHABILITATION ACT
### (DISCRIMINATION/FAILURE TO ACCOMMODATE)

74.   Jones realleges and incorporates by reference paragraphs 1 through 73 above, as though fully incorporated herein.

75.   Defendant is subject to section 504 of the Rehabilitation Act inasmuch as Defendant is the recipient of federal funds in the form of rent subsidies.

76.   Jones had a disability as defined by Rehabilitation Act in that he had an actual disability, a record of disability, or was regarded as disabled by Defendant.

77.   Jones was qualified for his maintenance job, and was able to perform the essential functions of his job with reasonable accommodation.

78.   Jones's disability substantially limits one or more major life activities, including his ability to focus, concentrate, sleep, and work.

79.   Jones was subjected to adverse employment actions by Defendant when it apparently discharged Jones in March 2018 and/or on or about May 9, 2018, on the basis of his disability, and refused to provide a reasonable accommodation of a leave absence or a modified work schedule.

80.   As a direct and proximate result of Defendant's actions and/or failure to act, Jones has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Jones is thereby entitled to general and compensatory damages in an amount to be proven at trial as well as any other equitable remedies available to him.

81.   Defendant's conduct was malicious and oppressive, and done with reckless disregard for Jones's federally protected rights, for which Jones is entitled to punitive damages.

## **ATTORNEY'S FEES**

82.   As a further direct and proximate result of Defendant's actions and/or failures to act, Jones has been compelled to retain the services of counsel, and has thereby incurred and will continue to incur costs and attorney's fees which Defendant should be required to pay pursuant to 42 U.S.C. § 12205, 42 U.S.C. § 2000e-5(k), U.S.C. § 2617, and 29 U.S.C. § 794(a)**.**

## **DEMAND FOR JURY TRIAL**

Jones demands trial by jury as to all issues triable to a jury in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Jones seeks judgment against Defendant as follows:

1.   For compensatory and general damages as well as statutorily available damages in an amount as shall be proven at trial, and any available equitable remedies;

2.   For liquidated damages;

3.   For punitive damages;

4.   For attorney's fees pursuant to statute and costs of suit;

5.   For prejudgment interest or all amounts claimed; and

6.   For such other and further relief as the Court deems just and proper.

Dated this 30th day of December, 2019.

_____/s/_____
DeAnne Casperson
CASPERSON ULRICH DUSTIN PLLC

11 - COMPLAINT AND DEMAND FOR JURY TRIAL